UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | 2:15-CR-00138-JRG |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| DARRIES LEON JACKSON, | ) | |
| | ) | |
| Defendant | ) | |

**REPORT AND RECOMMENDATION**

Defendant Darries Leon Jackson ("Jackson"), proceeding *pro se,* has filed a motion to dismiss the indictment with prejudice, claiming that African–Americans were systematically excluded from the Grand Jury selection process [Doc. 43]. This matter is before the Court pursuant to 28 U.S.C. § 636 and the standing orders of the District Court. An evidentiary hearing was conducted on December 1, 2016.

**I.     PROCEDURAL HISTORY**

On November 8, 2016, this Court granted in part Jackson's motion to produce juror information [Doc. 44] and his motion for "Freedom of Information Act" [Doc. 53]. The Court authorized the disclosure of the relevant statistical information for purposes of permitting Jackson to challenge the selection process [Doc. 78, pg. 2]. The Court denied his request for the names and dates of service and race of the grand jurors for the last 30 years because the Clerk's office does not maintain information dating back that long. However, the Court directed the Deputy Clerk, John Medearis, to file an affidavit detailing the grand jury and petit jury selection process and provide statistical information regarding the percentage of African-Americans in the general population for the Greeneville Division and the percentage of African-Americans in the

1

Greeneville Master and Qualified Jury Wheel. Once the statistical information pertaining to the 2013 grand jury was disclosed, the Court found it necessary to conduct an evidentiary hearing to address the specifics of the grand jury and petit jury selection process and permit Jackson to introduce any additional evidence pertaining to his motion to dismiss.

## II. FINDINGS OF FACT

At the evidentiary hearing, the only witness to testify was Deputy Clerk John Medearis ("Medearis"). Jackson presented no evidence. Medearis testified that he is responsible for supervising the operations of the Clerk's Office including the filling of both the Master and Qualified Jury Wheels and the summonsing of persons from the Qualified Jury Wheel for potential jury service. This process is set forth in the *Jury Selection Plan of the United States District Court for the Eastern District of Tennessee for the Random Selection of Grand and Petit Jurors Jury* (the "Jury Plan"). *Exhibit 5*.

Medearis explained the process used to summons qualified jurors. The Clerk's Office receives from the Tennessee Secretary of State voter registration lists for all the counties in the division. That list is provided to Blue Grass Mailing Data and Fulfillment Services ("Blue Grass"), a third-party independent contractor retained by the Clerk's office, to randomly populate the Master Jury Wheel. Blue Grass randomly draws names using an automated selection system from the voter registration lists so that the registered voters in each county will be represented proportionally in the Master Jury Wheel.[1] Blue Grass then provides those randomly selected names from each county to the Clerk's office in a format compatible with the Clerk's Jury

---

[1] Each county is represented proportionately in the Master Jury Wheel. For example, if there are 240,000 names on the voter registration list of all counties within the division, and there are 48,000 names on county "A's" list (twenty percent of the total), then the number of county "A's" names initially selected should be substantially twenty percent of the total number selected from all counties within the division.

2

Case 2:15-cr-00138-JRG-MCLC   Document 103   Filed 12/19/16   Page 2 of 15   PageID #: 270

Management System ("JMS").[2] These names constitute the Master Jury Wheel and are loaded into JMS. The Clerk's Office then uses JMS to randomly select names to whom the Clerk will send juror questionnaires. *See* 28 U.S.C. § 1864. These questionnaires, prescribed by the Administrative Office, require potential jurors to answer certain questions that relate to their qualifications to serve as a juror and require each to identify, among other things, his/her race.[3] See 28 U.S.C § 1869(h).

In this case, 1,000 questionnaires were mailed out to prospective jurors randomly selected from the Master Jury Wheel, from which 695 were returned. The Clerk's Office entered the answers from each questionnaire manually into JMS.[4] The Clerk's Office then employed JMS to identify which of the 695 were qualified for jury duty based on their answers on the questionnaire. JMS determined that out of the 695 who completed the questionnaires, 541 met the Plan's qualifications. Race was not a factor used to determine ineligibility.[5] Those not disqualified made

---

[2] JMS is an automated system developed by Software and Services, LLC, which is used by federal and state courts throughout the nation.

[3] A copy of the questionnaire was introduced and made a part of the record. *Exhibit 2*. The statute requires the juror qualification form to "elicit the name, address, age, race, occupation, education, length of residence within the judicial district, distance from residence to place of holding court, prior jury service, and citizenship of a potential juror, and whether he should be excused or exempted from jury service, has any physical or mental infirmity impairing his capacity to serve as juror, is able to read, write, speak, an understand the English language, has pending against him any charge for the commission of a State or Federal criminal offense punishable by imprisonment for more than one year and has not had his civil rights restored." 28 U.S.C. § 1869(h).

[4] The forms are able to be scanned, but Deputy Clerk Medearis testified that it was the Clerk's Office preference to enter the information manually.

[5] The following are the criteria to determine ineligibility:
    (1) is not a citizen of the United States eighteen years old who has resided for a period of one year within the judicial district;
    (2) is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form;
    (3) is unable to speak the English language;

3

up the qualified jury wheel. From the qualified jury wheel, the Clerk, again using JMS, randomly selected the names to whom it mailed summonses for assignments to grand or petite jury panels. That was the process followed in this case.

Medearis also testified to the racial composition of the Master and Qualified Jury Wheels going back to 2005. He testified that the Master and Qualified Jury Wheel were filled on three occasions: March 21, 2005, June 30, 2009, and August 26, 2013. In 2005, African-Americans constituted 2.2 percent of the general population for the division and 1.86 percent of the Qualified Jury Wheel. In 2009, African–Americans constituted 2.2 percent of the general population in this division, and 1.31 percent of the Qualified Jury Wheel. For 2013, African–Americans made up 2.3 of the general population in the division but composed only 0.74 percent of the Qualified Jury Wheel.[6]

### III. ANALYSIS

Racial discrimination in the selection of grand jurors "strikes at the fundamental values of our judicial system and our society as a whole," and is "especially pernicious in the administration of justice." *Rose v. Mitchell*, 443 U.S. 545, 555-56 (1979). The courts have long "recognized that a criminal defendant's right to equal protection of the laws has been denied when he is indicted by a grand jury from which members of a racial group purposefully have been excluded." *Rose,* 443

---

(4) is incapable, by reason of mental or physical infirmity, to render satisfactory jury service; or
(5) has a charge pending against him for the commission of, or has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored.
28 U.S.C § 1865(b).

[6] These numbers are set out in the AO 12 Reports that were created after the filling of the jury wheel in 2005, 2009, and 2013. Each of these reports were introduced and made a part of record. *Exhibits 3, 6 and 7.*

4

U.S. at 556. The Court considers Jackson's motion to challenge the grand jury selection process on both Fifth and Sixth Amendment grounds.

### A. Fifth Amendment

A defendant can allege a Fifth Amendment equal protection violation based on a grand jury selection process one of three ways. The first is to show intentional discrimination. Jackson has not presented any evidence on that. The second focuses on whether African-Americans were substantially underrepresented over a significant time period and whether the selection process was "susceptible of abuse" or "not racially neutral." *Casteneda v. Partida*, 430 U.S. 482, 494 (1977). The third focuses on underrepresentation for the *particular* grand jury which indicted the defendant and whether the selection process for that grand jury is open to discrimination. See *Jefferson v. Morgan,* 962 F.2d 1185 (6th Cir. 1992). The Court will analyze both the way the system of selection works to choose grand and petit jurors and the particular grand jury that indicted Jackson.

#### i. The System of Selection/*Castaneda* Factor-Test

Under the Fifth Amendment, in order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs. See *United States v. Ovalle*, 136 F.3d 1092, 1104 (6th Cir. 1998)(applying *Castaneda's* equal protection analysis to a defendant's claim under the Fifth Amendment); see also *Castaneda,* 430 U.S. at 494. To do this, the defendant must meet a three-part test. First, the defendant must "establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied." *Castaneda*, 430 U.S. at 494, 97 S. Ct. 1272. Second, "the degree of underrepresentation must be proved, by comparing the

proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time." *Id*. Third, the defendant must establish that the selection procedure was susceptible to abuse or was not racially neutral, "support[ing] the presumption of discrimination raised by the statistical showing." *Id*. Jackson claims that each of these factors has been met.

        **a.    Factor One – A recognizable, distinct class, singled out for different treatment.**

The Court agrees with Jackson that the first factor has been satisfied. It is undisputed that African-Americans are a "distinctive group" for the purpose of jury composition challenges. *Peters v. Kiff,* 407 U.S. 493, 503 (1972); *Jefferson*, 962 F.2d at 1189. The United States does not contest the point.

        **b.    Factor Two – Underrepresentation in this division over a significant period of time.**

The second factor focuses on whether African–Americans have been underrepresented in this division over a significant period of time. Underrepresentation is determined by comparing the proportion of African–Americans in the total population of this division to the proportion called to serve as grand jurors over a significant period of time. In *Castaneda,* the Supreme Court described this method of proof as a "rule of exclusion." That is, "if a disparity is sufficiently large, then it is unlikely that it is due solely to chance or accident, and, in the absence of evidence to the contrary, one must conclude that racial or other class-related factors entered into the selection process." *Id.* at 494, n. 13.

In this case, the following Table illustrates the proportions for comparison purposes:

6

| Year | Total Qualified in Jury Pool Wheel | African–Americans in Qualified Jury Wheel ("QJW") | Percentage of African-Americans in QJW | Percentage of African–Americans in population area |
|---|---|---|---|---|
| 2005 | 429 | 8 | 1.86 % | 2.2 % |
| 2009 | 306 | 4 | 1.31 % | 2.2 % |
| 2013 | 541 | 4 | .74 % | 2.3 % |
| **TOTAL** | **1,276** | **16** | **1.25 %** | **2.3 %** |

In *United States v. Miller*, 562 F. App'x 272 (6th Cir. 2014), the Sixth Circuit, in analyzing the statistics for 2005 and 2009, found that the degree of underrepresentation was not substantial. It calculated (1) the simple difference between the percentage of African-Americans in the jury wheel and in the general population and (2) the ratio between the percentage of African-Americans in the jury wheel and in the general population in the division. *Id.* at 280. It found that under either analysis African-Americans were not underrepresented. *Id.*

This Court now has another set of data to analyze for 2013. Out of 541 individuals in the qualified jury wheel, only four are African-Americans. For this particular grand jury, the simple difference is 1.56 percent. The ratio between the percentage of African-Americans in the qualified jury wheel to the percentage in the general population is 32.2 percent.

As Jackson notes, the analysis must be over a significant period of time. In this case, when factoring in the 2013 statistical sampling with those for 2005 and 2009, African-Americans appear in the qualified jury wheel at an average rate of 58.7 percent of their rate in the general population for this district. This percentage is at a higher rate than what the Supreme Court has found significant in the past. See *Miller,* 562 F.App'x at 280(citing *Castaneda*, 430 U.S. at 486–87, 97 S.Ct. 1272 (Mexican–Americans comprised 39 percent of jury wheel, about half of their rate (79.1 percent) in the general population); *Sims v. Georgia*, 389 U.S. 404, 407, 88 S.Ct. 523, 19 L.Ed.2d

7

634 (1967) (African–Americans constituted 24.4 percent of taxpayer population, but only 4.7 percent of grand jury); *Whitus v. Georgia*, 385 U.S. 545, 552, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967) (the 9.1 percent of African–Americans in the grand jury pool constituted about one third of their rate in the general population of taxpayers (27.1 percent)). Thus, it does not appear that, even when factoring in the latest statistics for 2013, African-Americans are underrepresented at a statistical rate that has concerned the Supreme Court. However, in light of the disturbing downtrend, the Court finds it necessary to consider the third factor to resolve Jackson's motion, assuming that this factor has been satisfied.

        **c.     Factor Three – Whether the selection procedure is susceptible to abuse or not racially neutral.**

The third factor focuses on whether the selection procedure was susceptible to abuse or was not racially neutral, "support[ing] the presumption of discrimination raised by the statistical showing." *Castaneda*, 430 U.S. at 494, 97 S. Ct. 1272. This requires an examination of the process the Clerk's office follows to fill the master and qualified jury wheel.

As noted, Jackson introduced no evidence of abuse or systematic exclusion of African–Americans. He merely reasserted his belief that abuse was occurring and attacked the validity of the voting registration lists themselves. He contended that the voter registration lists must be compromised or else President-Elect Donald Trump would not have publicly declared the voting system was rigged. Jackson, however, provided no actual proof to substantiate his claims.[7]

The Court readily expresses concern over the disturbing downtrend in the African-American participation rate in the grand jury and petit jury process. But Jackson points to no

---

[7] If any issue did in fact exist with respect to the jury registration list, that would be out of control of the Clerk's Office. Jackson failed to introduce any evidence, however, even to raise a scintilla of suspicion of any problems with respect to the voter registration issue.

8

problem in the selection process that would cause this trend. While he claims the voter lists must be "rigged," no challenge based solely on a grand jury system composed of a randomized selection of jurors from voter registration lists has ever been successful. *See United States v. Odeneal*, 517 F.3d 406, 412 (6th Cir. 2008)(citing *United States v. Test*, 550 F.2d 577, 587 n.8 (10th Cir. 1976) (collecting cases)("[T]he circuits are in complete agreement that . . . neither the Act nor the Constitution require that a supplemental source of names be added to voter lists simply because an identifiable group votes in a proportion lower than the rest of the population")). Indeed, 28 U.S.C. § 1863(b)(2) contemplates districts using the voter registration lists from which to draw names of potential jury members. As recently as 2014, the Sixth Circuit noted that "[v]oter registration lists are the presumptive statutory source for potential jurors" and that the Constitution does not require a supplemental source "'simply because an identifiable group votes in a proportion lower than the rest of the population.'" *Miller*, 562 F. App'x at 281-82 (quoting *Odeneal,* 517 F.3d at 412).

Based upon the evidence presented, the Court finds that there is nothing in the jury selection plan that is susceptible to abuse, and Jackson does not point to any place in the process where abuse could occur. Indeed, this Court has the benefit of the Sixth Circuit having specifically examined this division's jury selection process and found it to be in compliance with Constitutional standards. *Id.* Accordingly, the Court finds that, in considering the *Castaneda* factors, Jackson has failed to establish a Fifth Amendment equal protection violation.

### ii. This particular grand jury

A defendant also "can establish a prima facie case of racial discrimination in the selection of jurors by demonstrating … underrepresentation of the petitioner's race on the *particular* grand jury that indicted the petitioner and a selection system that is subject to abuse. *Jefferson v. Morgan*, 962 F.2d 1185, 1191 (6th Cir. 1992)(emphasis added). "[T]he Supreme Court noted that absent

9

evidence of systematic, long-term underrepresentation, a petitioner could establish a prima facie case of an equal protection violation by demonstrating that (1) members of his race were substantially underrepresented on the venire from which his particular jury was drawn; and (2) the venire was selected under a practice providing an opportunity for discrimination." *Jefferson*, 962 F.2d at 1190 (citing *Batson v. Kentucky*, 476 U.S. 79, 95 (1986)).

Assuming that African-Americans were substantially underrepresented in the particular grand jury that indicted Jackson, underrepresentation is not sufficient to mount a successful Equal Protection challenge. For there to be an Equal Protection violation, the selection process must still be open for discrimination. Jackson must also show the selection process was subject to abuse. On that issue, he has not presented any evidence.

The selection process was wholly randomized by an automated system. The protocols utilized by the Clerk's Office were race neutral. At each step of the selection process—from initially choosing the names from each county to those who were sent summonses for assignments to grand and petit jury panels—names were randomly drawn. The only racial identifiers used in the process were mandated by federal law. *See* 28 U.S.C. § 1869(h). It is true that the Clerk's Office manually inputted the answers from the questionnaires into JMS, but no individual made any disqualification decisions based on the questionnaires. The JMS program made those determinations. The inputting of data was an administrative act. As an automated selection process was used to randomly chose the selected names, Jackson cannot identify where in the process there was any opportunity for the race of potential jurors to be considered. Simply, no human input went into selecting jurors or determining eligibility to serve at any point in the process. Accordingly, the Court finds no equal protection violation occurred in considering the impanelment of this particular grand jury.

**B.     Sixth Amendment Claim**

The Sixth Amendment guarantees criminal defendants the right to a trial "by an impartial jury." U.S. Const. amend. VI. An impartial jury is one drawn from a "representative cross section of the community." *Taylor v. Louisiana,* 419 U.S. 522, 528 (1975); *United States v. Brown*, 128 F. Supp. 2d 1034, 1038 (E.D. Mich.2000). In 1968, Congress enacted the Jury Selection and Service Act ("JSSA") that also codified a criminal defendant's right to a jury "selected at random from a fair cross section of the community." 28 U.S.C. § 1861. To establish a prima facie violation of the fair cross section requirement, in *Duren v. Missouri*, 439 U.S. 357, 99 S. Ct. 664, 58 L.Ed.2d 579 (1979), the Supreme Court held a defendant must prove:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Id.* at 364.

The first factor has been satisfied as African-Americans are a "distinctive" group in the community under *Duren.* That is not in dispute.

The second factor focuses on underrepresentation, that is, whether the representation of the group is not fair in relation to the number of such persons in the community. In *Berghuis v. Smith*, 559 U.S. 341, 323 (2010), the Supreme Court noted two means of measuring the extent of underrepresentation: absolute disparity and comparative disparity.[8] In this case, based on the statistics provided by the Clerk's Office, the absolute disparity is 1.56 percent, meaning that

---

[8] Absolute disparity is "determined by subtracting the percentage of African–Americans in the jury pool . . . from the percentage of African–Americans in the local, jury-eligible population." *Id.* Comparative disparity is "determined by dividing the absolute disparity . . . by the group's representation in the jury-eligible population. . . ." *Id.*

11

African–Americans were underrepresented by 1.56 percent. The comparative disparity is 67 percent, meaning that that African–Americans were, on average, 67 percent "less likely, when compared to the overall jury-eligible population, to be on the jury-service list." *Id.*

Given the relatively small percentage of the population of African–Americans in this community, the Court finds the absolute disparity not very meaningful given that only 2.3 percent of the population in this district is African-American. *See, e.g.*, *Berghuis,* 559 U.S. at 329; see also *United States v. Chanthadara*, 230 F.3d 1237, 1256 (10th Cir. 2000) ("absolute disparities are of limited value when considering small populations"). The absolute disparity in this case could not be more than 2.3 percent under any circumstance. The comparative disparity method also has limited utility where the population of the group at issue is small. *See e.g.*, *United States v. Shinault*, 147 F.3d 1266, 1273 (10th Cir. 1998) ("[T]he smaller the group is, the more the comparative disparity figure distorts the proportional representation") (quotations and citations omitted). The Supreme Court does not mandate the use of either of these methods "to measure the representativeness of distinct groups in jury pools." *Berghuis*, 559 U.S. at 329. Each method has its own weaknesses.

What is of some insight is the ratio between the percentage of African–Americans qualified in the jury wheel and that of the population of African–Americans in the area. In this case, as noted, the number of African–Americans in the general population of the area equaled 2.3 percent, but only .74% percent qualified in the jury wheel, giving a ratio of 32 percent (.74/2.3). That is significant underrepresentation, but is not dispositive on the issue as the system itself must exclude African-Americans.

The third element focuses on whether African-Americans are systematically excluded from serving on the grand jury.[9] Underrepresentation alone is not sufficient to sustain a Sixth Amendment challenge to the selection process. "[I]t has long been the case that defendants are not entitled to a jury of any particular composition—only to a panel from which distinctive groups were not 'systematically excluded.'" *Allen*, 160 F.3d at 1103 (quoting *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975)).

Defendant suggests that this "systematic exclusion" may be presumed, citing to *Rose v. Mitchell*, 443 U.S. at 566. But *Rose* does not address the system at work in this case. In *Rose*, jurors were selected by jury commissioners and foremen by judges. In *Miller*, the Sixth Circuit distinguished the process used in *Rose* from what this district used to select jurors, finding the system in *Rose* substantially different than the "randomized process used by the federal court here…." *Id.* at 281. The Supreme Court in *Rose* warned against relying on broad arguments of historical discrimination in the place of case-specific evidence in jury-selection cases. *Rose,* 443 U.S. at 572 n. 12. In other words, it is a case-specific analysis.

In *Ford v. Seabold*, 841 F.2d 677 (6th Cir. 1988), the Sixth Circuit noted that the petitioner could point

> to nothing in the selection process which makes it obvious that the underrepresentation was due to the system itself. We do not believe that the selection of jurors from a neutral master list, without more, can be construed as 'systematic exclusion' as defined in *Duren* merely because the percentage of women selected does not precisely mirror the percentage of women in the entire community. No evidence was presented by Ford indicating that the jury commissioners utilized a particular system or procedure in order to exclude women.

---

[9] "In the absence of a *per se* systematic exclusion, a defendant must establish that the challenged disparity is 'inherent' in the jury selection process itself." *Bates v. United States*, 473 F. App'x 446, 450 (6th Cir. 2012) (citing *United States v. Allen*, 160 F.3d 1096, 1104 (6th Cir. 1998)). Jackson has not presented any evidence of intentional exclusion that would amount to a *per se* systematic exclusion of African-Americans from the selection process.

13

*Ford*, 841 F.2d at 685; *see also United States v. Footracer*, 189 F.3d 1058, 1062 (9th Cir. 1999) ("[T]he overwhelming weight of authority . . . establishes that a jury selection system does not systematically exclude a distinctive group where the system treats all groups equally but has a disparate impact on one or more"). This Court does not find that the system utilized to select grand and petit juror members systematically excludes members of the African-American race. In fact, as recently as 2014, the Sixth Circuit found that the selection process for this district passed constitutional muster. *See Miller*, 562 F. App'x at 280-82.[10]

Jackson does not identify anything in the selection process that suggests that any underrepresentation was due to the actual system itself. Although referencing comments from President-Elect Trump about voting in general, he has provided no evidence indicating that the particular system or any procedures used by this district targeted African–Americans in order to exclude them. The creation and operation of the Jury Plan relies on facially neutral source lists and random selection at multiple intervals. Although arguably a disparate impact seems to have occurred, the jury selection system itself treats all groups equally. There is nothing to suggest this is anything more than mere happenstance or a statistical anomaly based on the evidence before the Court.

Moreover, nothing in the record indicates that this underrepresentation was caused by this division's jury selection process. The issue is what caused the underrepresentation. "[S]peculation that an issue might contribute to the underrepresentation of African–Americans is not enough to

---

[10] The primary difference between the Jury Plan reviewed in *Miller* and the one at issue here is that a contractor was used for the creation of the Master Jury Wheels as opposed to the Clerk's Office. The selection of names at random to fill JMS, and the random selection of names to be sent summonses for jury service were consistent.

14

Case 2:15-cr-00138-JRG-MCLC Document 103 Filed 12/19/16 Page 14 of 15 PageID #: 282

establish a prima facie Sixth Amendment violation."[11] *Bates v. United States*, 473 F. App'x 446, 451 (6th Cir. 2012) (citing *Berghuis*, 130 S.Ct. at 1395). Accordingly, Defendant's Sixth Amendment challenge fails as well.

Based upon the reasons stated therein, this Court respectfully RECOMMENDS that Jackson's motion to dismiss [Doc. 43] be DENIED.[12]

SO ORDERED:

s/Clifton L. Corker
United States Magistrate Judge

---

[11] Certainly a cause for this could be that African-Americans are not registering to vote in the same proportion to their percentage in the population. If that were the case, then one would expect underrepresentation. But that would not be an issue "inherent" to the jury selection procedures, but instead would be the result of individual choice. *Bates,* 473 F.App'x at 451. No evidence was presented that addressed any barriers to African-Americans being able to register to vote in this district under Tennessee law.

[12] Any objections to this report and recommendation must be filed within 14 days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1).